**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

BV ADVISORY PARTNERS, LLC, a New
Jersey Limited Liability Company, and
WAVETECH GLOBAL, INC., a Delaware
Corporation,

*Plaintiffs,*

v.

WAVETECH GMBH, a German Corporation,

*Defendant.*

Civil Action No. _____

**COMPLAINT**

**(Demand for Jury Trial)**

---

Plaintiffs BV Advisory Partners, LLC, a New Jersey limited liability company ("BV" or "BV Partners") and WaveTech Global, Inc., a Delaware corporation ("Global") (together, "Plaintiffs"), by and through their undersigned counsel, hereby bring this civil action against Defendant WaveTech GmbH, a German corporation ("GmbH" or "Defendant"), alleging as follows:

## NATURE OF THE CASE

1.     This is an action seeking preliminary and permanent injunctive relief and/or damages relating to a material breach of an agreement between GmbH and BV after GmbH, ***first***, scuttled a merger between Global and a publicly traded Company, and ***then***, stole the transaction for itself.  With the new merger agreement filed, GmbH—in violation of exclusivity provisions—plans to walk away with over $500 million in deal value.

2.     However, GmbH did not stop here:  instead, GmbH has engaged in a wholesale effort to sabotage Plaintiffs' business.  GmbH has harassed employees, investors, and business partners, falsely used BV marketing materials to raise additional funds, and interfered with Plaintiffs' business partners, resulting in millions of dollars of damage.  Plaintiffs seek damages related to this tortious and inexcusable conduct.

3.      As described in more detail herein, GmbH's wrongful conduct started at least two months ago.  With only hours to go before a merger between Global and Spectrum Global Systems, Inc. ("Spectrum") was set to close on May 17, 2019, GmbH forwarded a letter to Spectrum falsely claiming that there were "ownership issues" between BV and GmbH and that the merger would need to be postponed.  Even though GmbH admitted that it was not a party to the merger agreement, GmbH claimed that it was not "agreeable to continuing the Spectrum transaction."  The letter had one purpose:  to tank the merger.

4.      GmbH's letter had an immediate effect:  Spectrum refused to close the merger. Less than two months later, Spectrum announced that it had entered into a merger agreement *with GmbH*.  GmbH's intentions have now become clear—block the merger and replace Global with itself and utilize BV's property and business relationships for itself.

5.      As to the latter point, separate and apart from that wrongful scheme, GmbH's hand has been visible in sabotaging Plaintiffs' relationships with various partner companies. Specifically, on July 13, 2019, a Global affiliate, Southern Power System, Inc., suddenly and inexplicably announced that it no longer wanted to do business with Global or BV.  Later, on July 16, 2019, another business partner, Re-Tron, announced as well that it no longer wanted to work with Global or BV.  The common thread in each of these terminations is GmbH.

6.      Topping all of this is the fact that GmbH has also been caught red-handed raising funds in Europe using BV's name, logo, and materials in a false and misleading manner.  Unless immediate injunctive relief is granted, Global and BV will be irreparably harmed.

7.      GmbH's salt-the-earth tactics need to be stopped immediately.  GmbH has stolen Global's merger deal in violation of the exclusivity provision and is now working to destroy Plaintiffs' business.

## PARTIES

8.      Plaintiff BV is a global strategic advisory and expert consulting firm that provides independent advice and regulatory and dispute consulting to clients that include global corporations, major law firms, financial institutions, family offices, and high net worth individuals. BV is a limited liability company formed under the laws of the State of New Jersey.

9.      Plaintiff Global is a global next generation software and data analytics company that specializes in monitoring, predicting, and protecting business operations, intellectual property development, and implementation services.  Global is incorporated under the laws of the State of Delaware and is 100 percent owned by Plaintiff BV and various affiliates.

10.      Defendant GmbH is a German technology company based in Rheinbach, Germany. GmbH is a *Gesellschaft mit beschränkter Haftung*, or a limited liability corporate entity, formed under the laws of the Federal Republic of Germany, with its principal place of business in Rheinbach, Germany.  According to Section 2 of GmbH's *Gesellschaftsvertrag* (Articles of Association), the "corporate purpose of the Company shall be the development, the production and the sale of electronic products (primarily in cooperation with partners) essentially to increase the useful life of electronic accumulators and in this connection the development of new technologies."

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) (diversity jurisdiction) because Plaintiffs and Defendant are citizens of different states and the amount in controversy exceeds the sum or value of $75,000.

12.      This Court has personal jurisdiction over GmbH under the terms of the Retention Agreement (attached as Ex. A).  Specifically, the Retention Agreement provides at Section 17:

This Agreement (including all exhibits hereto) shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be fully performed therein, without regard to conflicts of law principles. The Company [GmbH] irrevocably submits to the exclusive jurisdiction of any State or Federal court sitting in the State of New York for the purpose of any suit, action or other proceeding arising out of this Agreement, or any of the agreements or transactions contemplated hereby, which is brought by or against the Company, and agrees that service of process in connection with any such suit, action or proceeding may be made upon the Company in accordance with Section 15 hereof.

13.     Under Section 15, GmbH can be served by overnight courier service, return receipt requested, sent to "Wavetech GmbH, Marie-Curie-Str. 5, 53359 Rheinbach, Germany, Attention: Dag Arild Valand." Additionally, "any notice given by overnight courier shall be deemed given on the next business day after delivery to the overnight courier."

## STATEMENT OF FACTS

### A. The Business Relationship Between BV and GmbH.

14.     In the fall of 2017, GmbH approached BV with technology known as Crystal Control Technology ("CCT") that it claimed could be used to control the growth of crystals for the manufacture of lead-acid batteries. The purported effect of CCT is, according to GmbH, increased durability of battery electrodes and a substantial saving of the electric current needed to charge batteries.

15.     With BV being interested in CCT, but uncertain whether such technology was commercially viable, it agreed to partner with GmbH in attempting to raise capital to exploit the technology. On November 15, 2017, BV and GmbH entered into the Retention Agreement for BV "to provide strategic advisory, business consulting, and M&A services" to GmbH and, among other things, to "help identify potential merger candidates in the US" and to help with "preparing it to list in the US."

4

16.     Under the Retention Agreement, BV would be GmbH's "exclusive United States financial advisor and strategic advisor." Specifically, Section 10 of the Retention Agreement provides:

> **United States Exclusivity.**   During the Term, the Company [GmbH] will inform BV Partners of all other offers with respect to any United States Financing or United States Alternative Transaction, (including all inquiries and offers which the Company may have received concerning an investment in the Company prior to the date hereof).  In addition, the Company hereby irrevocably agrees not to circumvent, avoid, bypass, or obviate, directly or indirectly, the intent of this Agreement through any transaction, transfer, pledge, agreement, recapitalization, loan, lease, assignment or otherwise.  The Company (including affiliates of such parties) agrees that it will not attempt, directly or indirectly, to contact parties introduced to the Company by BV Partners on matters described in this Agreement or contact or negotiate with any confidential source provided by BV Partners, except through BV Partners or with the express written consent of BV Partners as to each such contract.  The Company shall not contact, deal with, or otherwise become involved in any transaction during the Term of the Agreement with any corporation, partnership, individual, any banks, trust, or lending institutions which have been introduced by BV partners without the permission of BV Partners.  Any violation of this provision shall be deemed an attempt to circumvent this provision, and the Company shall be liable for damages in favor of the circumvented party.

In short, this provision prevents GmbH from making any attempted end run around BV in negotiating a transaction.

17.     The Retention Agreement provides that nothing contained therein "shall limit or restrict the right of BV or of any partner, employee, agent or representative of [BV] Partners, to be a partner, officer, director, employee, agent or representative of, investor in, or to engage in, any other business, whether or not of a similar nature to [GmbH's] business" and that "BV Partners may, but shall not be required to, present opportunities to the Company."

18.     Exhibit A to the Retention Agreement includes robust indemnification provisions whereby GmbH agreed to "indemnify and hold harmless BV Partners" together with each of the other "Indemnified Parties" as defined in the provision.

19.     The Retention Agreement has not been terminated by either party.

**B. BV and GmbH Enter into the Preliminary Agreement.**

20.     On December 1, 2017, BV incorporated WaveTech, Inc., a Delaware corporation, with 100 percent of the stock held by BV.  Shortly thereafter, on December 17, 2017, GmbH, BV, and WaveTech, Inc. entered into a Preliminary Cooperative and Governance Agreement (the "Preliminary Agreement") in which the parties agreed to "act in good faith towards negotiating and entering into all necessary agreements, steps and processes" with the goal of making GmbH and WaveTech, Inc. subsidiaries (through reverse mergers) of a publicly traded United States holding company.

21.     The Preliminary Agreement provides that WaveTech, Inc. was "formed for the sole purpose of marketing and distributing WaveTech Gmbh's patented Crystal Control Technology (CCT) for the backup power storage industries."  It also provides that, in addition, WaveTech, Inc. would be the vehicle for raising up to $15 million in capital "to fund the growth capital expansion of WaveTech Gmbh, to fund WaveTech GmbH operation and expansion and to start operations in the US and the rest of the Americas, and to fund a reverse merger with a US publicly listed [shell] company (PUBCO)."

22.     Under the Preliminary Agreement, GmbH agreed to make its CCT technology available to WaveTech, Inc. "on viable, commercial terms."  BV agreed to "manage the process" of raising capital for WaveTech, Inc. using bonds convertible at WaveTech, Inc.'s option and effecting a "subsequent reverse merger with a US publicly traded shell company."

23.     The Preliminary Agreement provided that BV "shall initially own 100% of WaveTech, Inc." and that GmbH would have the option "to purchase all the initial shares of Wavetech Inc[.] at their nominal value" any time before the conversion of the bonds into common stock.  The bonds would be converted into common stock upon execution of a merger agreement with a publicly traded U.S. company.[1]

24.     BV would "initially be responsible for set-up and managing the process of Wavetech, Inc. raising up to $15million to fund the comptemplated [*sic*] reverse merger transaction, the take over of WaveTech Gmbh, and the set-up of the US business."

25.     Finally, Section 13 of the Preliminary Agreement provides "[i]f deemed necessary by one of the Parties, all Parties agree to negotiate a more comprehensive and detailed agreement to replace this preliminary cooperative and governance agreement."  The parties agreed "to negotiate all matters en route in good faith and likewise to conclude all furhter [*sic*] agreements needed to achieve the goals defined in this agreement."

26.      In fulfillment of its obligations under the Preliminary Agreement, BV raised $5 million for WaveTech, Inc. through the issuance of convertible bonds.

**C.  BV Becomes Concerned with GmbH's Business Viability.**

27.     In August 2018, BV travelled to Turkey to meet with a major GmbH client.  During the meetings with the Turkish client on August 8, 2018, the client expressed its extreme dissatisfaction with GmbH's management execution, advising that it had been working with GmbH for over six months, but had never received any deliveries of a working CCT product.

---

[1] At the time the Preliminary Agreement was entered into, BV objected to this language, and as a condition to signing the Agreement, GmbH agreed that this provision would be abrogated.

28.    With BV alerted to the serious issues concerning GmbH's lack of management competence and ability to commercially scale CCT, BV intensively investigated the technology and started to explore a broader technology strategy.  After this investigation, BV became concerned that GmbH was unlikely to be able to perform its obligations under the Preliminary Agreement.

29.    For example, BV asked GmbH to run a test involving lithium ions to prove that the CCT product worked.  To BV's knowledge, GmbH never ran the test and never proved the viability of CCT with lithium ion batteries.

30.    With BV willing to allow GmbH to continue to work through its operational and development issues, BV—with the full knowledge of GmbH—decided to form Global in November 2018 as a separate company which focused on technology not involving CCT.  Despite the use of the name "WaveTech," Global was formed as a Delaware corporation unrelated to WaveTech, Inc. and was 100 percent owned by BV.  Specifically, while WaveTech, Inc. was formed "for the sole purpose of marketing and distributing" GmbH's CCT, Global was formed as a software and data management company.

31.    Global did not compete with WaveTech, Inc. or GmbH, and as previously noted, Global's formation and purpose were fully disclosed to GmbH.  BV held out hope that GmbH would ultimately work out its operational and development issues and, honoring the intent of the Preliminary Agreement, BV continued to work with GmbH while building Global separately.

**D. Global Enters into the SPA.**

32.    Global was successful and made several acquisitions.  In early 2019, Global negotiated and entered into the Share Purchase Agreement, dated as of February 4, 2019 (or the "SPA"), with Spectrum Global Solutions, Inc. (as previously defined, "Spectrum"), a publicly traded U.S. company.  Spectrum, through three subsidiaries, held itself out as a leading provider

8

of telecommunications engineering and infrastructure services across the United States, Canada, Puerto Rico, Guam and the Caribbean.

33.     Because the SPA provided for the sale of all of Global's shares to Spectrum, the stockholders of Global (*i.e.*, BV) were made parties to the SPA.

34.     Under the SPA, Global provided Spectrum with $1,325,000 in cash upon execution of the SPA to be used by Spectrum to pay off obligations under a financing agreement with a third party.  The SPA provided that the cash would be treated as a deposit on cash payments due at closing.  If the transaction did not close, the cash deposit would be treated as a loan with a term of 60 days.

35.     On February 7, 2019, Spectrum and Global issued a press release announcing the merger agreement, stating that "WaveTech Global, Inc. will become the majority controlling shareholder of Spectrum."

36.     The SPA was fully disclosed to GmbH.  GmbH's principal Dag Valand was even quoted in the press release announcing the merger, and GmbH attended multiple due diligence sessions as part of the merger preparations.

37.     The post-merger combination of Spectrum and Global was anticipated to be valued at $500 million.

**E.  GmbH Breaches the Preliminary Agreement.**

38.     Based on its success in raising capital for WaveTech, Inc. and providing Spectrum as a merger partner for Global, BV attempted to negotiate a definitive agreement with GmbH to replace the Preliminary Agreement.

39.     GmbH, in breach of the contractual provision under the Preliminary Agreement, was unwilling to negotiate in good faith.

40.     On March 20, 2019, BV sent an email to GmbH invoking a provision of the Preliminary Agreement and giving formal notice of its request for "a more comprehensive agreement to replace" the Preliminary Agreement. The March 20 email pointed out that "the scope of the project has changed, and the value of the contributions made by BV Advisory Partners, LLC … has been much more significant than the current Preliminary Cooperative and Governance Agreement anticipated and currently reflects." The email expressed BV's "intent to negotiate in good faith en-route to a more comprehensive agreement that better reflects the value of the contributions BV Advisory Partners, LLC has made…."

41.     GmbH did not respond to BV's March 20, 2019 email.

42.     Later, in discussions with BV, GmbH refused to negotiate as required by the Preliminary Agreement, apparently upset by the fact that Global stood to benefit from the transaction with Spectrum.

**F.  GmbH and WaveTech, Inc. Scuttle the Merger.**

43.     With the merger of Global and Spectrum set to close on May 17, 2019, on May 16, 2019, GmbH sent two letters to BV.

44.     The first May 16 letter purported to exercise the "right and option to purchase all initial shares of WaveTech, Inc." pursuant to a provision of the Preliminary Agreement and stated that a check for $20,000, "representing payment at nominal value for those shares," was being delivered to BV. Although a copy of the check was attached to the letter, the check itself was never received by BV.

45.     The second May 16, 2019 letter referred to a "January 23, 2019 letter of intent ("LOI")" with Spectrum, as well as the SPA with Spectrum, and noted correctly that neither WaveTech, Inc. nor GmbH was a party to the LOI or the SPA.

46.     GmbH's second May 16, 2019 letter also alleged that BV had breached the Preliminary Agreement "in several [unspecified] ways."   Although neither WaveTech, Inc. nor GmbH was a party to the SPA, the letter stated that "neither GmbH nor WaveTech, Inc. are agreeable to continuing the Spectrum transaction."   GmbH "proposed that BV, GmbH, and Spectrum jointly meet to resolve ownership issues that create obstacles to the Spectrum transaction."

47.     At 9:59 a.m. on May 17, 2019, the day of the intended closing, GmbH forwarded both letters to the chairman and CEO and the president of Spectrum, Roger Ponder.   Based on GmbH's allegation of "ownership issues," Spectrum refused to close.

48.     These letters asserted false statements and promoted rights that GmbH did not have a proper basis to assert.

49.     GmbH killed the merger.

50.     To add insult to injury, despite repeated requests by Global, the $1,325,000 cash deposit that Global paid to Spectrum upon the execution of the SPA has not been repaid and is the subject of a related matter in the Southern District of New York captioned *WaveTech Global, Inc. and BV Advisory Partners, LLC v. Spectrum Global Solutions, Inc.*, 1:19 Civ. 06485 (AKH) (the "Spectrum Action") (discussed below).

**G. Litigation Ensues in Delaware and New York.**

51.     On June 7, 2019, two separate civil actions were filed in the State of Delaware within 20 minutes of each other.   GmbH filed a proceeding in the Court of Chancery of the State of Delaware under 8 *Del. C.* § 225 against BV and BV's principal Keith Barksdale ("Barksdale"), captioned *WaveTech GmbH v. Keith Barksdale and BV Advisory Partners, LLC*, C.A. No. 2019-0432-AGB (the "225 Proceeding").   The 225 Proceeding is an expedited proceeding under

Delaware law in which GmbH seeks to establish that it is now the 100 percent stockholder of WaveTech, Inc.

52.     Global and BV filed suit in the Complex Commercial Litigation Division of the Superior Court of the State of Delaware against GmbH and WaveTech, Inc., captioned *WaveTech Global, Inc. and BV Advisory Partners, LLC v. WaveTech GmbH and WaveTech, Inc.*, C.A. No. N19C-06-070 PRW CCLD (the "Superior Court Action"). The Superior Court Action sought damages for tortious interference with contract related to the SPA, prospective interference with business advantage, and breach of contract related to the breach of the Preliminary Agreement.[2]

53.     In the Section 225 Proceeding, BV and Barksdale counterclaimed under 8 *Del. C.* § 225, seeking to establish that they, and not GmbH, control WaveTech, Inc.

54.     Despite GmbH's effort to have a status quo order put in place in the 225 Proceeding which would place GmbH and its principals in control, the Court of Chancery issued a status quo order on July 8, 2019, leaving Barksdale in control as the President, CEO, and Sole Director of the Company.

55.     Trial in the Section 225 Proceeding is scheduled for October 9, 2019.

56.     Not to be outdone, after Global and BV filed the Superior Court Action, GmbH and WaveTech, Inc. filed a second Delaware Court of Chancery action, captioned *WaveTech GmbH and WaveTech, Inc. v. Keith Barksdale, BV Advisory Partners, LLC, and WaveTech Global, Inc.*, C.A. No. 2019-0437-AGB (the "Second Chancery Action"). The Second Chancery Action appeared to be a complaint filed in response to the Superior Court Action, seeking damages for, *inter alia*, breach of contract and breach of fiduciary duty claims.

---

[2] The Preliminary Agreement, which was breached by GmbH, has a Delaware choice of law and Delaware venue provision requiring "[t]he place of dispute resolution shall be in the Court of Wilmington, Delaware, United States of America."

57.     With the merger between Spectrum and Global no longer moving forward, Global sought the return from Spectrum of the $1,325,000 in advanced funds which was due to Global under the SPA. After Spectrum failed to provide any assurances that the advanced funds would be returned, Barksdale advised Spectrum on July 8, 2019, that Global would be seeking legal recourse.

58.     The following day, on July 9, 2019, Spectrum's CEO Roger Ponder sent the Termination Letter, stating:

> Spectrum Global Solutions, Inc. (the "Company") hereby terminates that certain Share Purchase Agreement, by and among the Company, WaveTech Global, Inc., and the stockholders of WaveTech Global, Inc., dated as of February 4, 2019, pursuant to Section 9.1(e) of such agreement.

Nothing referenced the return of the advanced funds, and to date, no funds have been returned.

59.     The Termination Letter made clear that Spectrum was not going to take responsibility for having walked away from the merger. The provision of the Agreement referenced in the Termination Letter states in relevant part:

> 9.1     Termination. This Agreement may be terminated at any time prior to the Closing as follows: …
>
> (e)     By Buyer [Spectrum], upon written notice to Sellers [Global stockholders], if the Closing has not occurred on or before February 28, 2019 for any reason other than delay or nonperformance of Buyer and only in the event that Seller has either caused, or not cured within twenty days, the reason for Buyer exercising its right to terminate this Agreement pursuant to this Section 9.1….

Section 9.2 of the Agreement states:

> Effect on Obligations. ***In the event of the termination of this Agreement pursuant to Section 9.1, no Party will have any liability under this Agreement to any other Party***, except that: (a) nothing herein shall relieve any Party from any liability for any breach of any of the representations, warranties, covenants and agreements set forth in this Agreement; and (b) the provisions of Article X shall survive such termination.

Emphasis added.

60.    Section 9.1(e) was not applicable.  Spectrum had not sent written notice to the "Sellers."  Moreover, the failure of the Closing to occur was caused, *first*, by the delay of Spectrum and, *second*, by the non-performance of Spectrum.  Spectrum cannot take refuge in Section 9.2.

61.    Spectrum further compounded its wrongful conduct with the issuance of a July 10, 2019 press release falsely stating that Spectrum "elected to terminate the Agreement [SPA] due to a failure of certain representations, warranties and conditions set forth in the Agreement." Spectrum's CEO further chimed in, stating, "Attempting to be a disciplined acquirer and having already completed a number of successful acquisitions, with the failure of certain material representations and conditions we simply felt it was in the best interest of our shareholders to not move forward with the Agreement at the present time."

62.    The statements in the press release were false and misleading and were also a further breach of the SPA.

63.    On information and belief, these false and misleading statements were made for the sole purpose of intentionally harming BV and in further evidence of the conspiracy between Spectrum and GmbH to misappropriate BV's business relationship with Spectrum.

64.    These defamatory statements led to an immediate influx of calls to Plaintiffs from incensed stockholders seeking to determine what improper had happened, causing harm to both Global's and BV's reputations.

65.    With Spectrum now showing its true colors, Global and BV filed the Spectrum Action on July 12, 2019, in the Southern District of New York.  The Spectrum Action sought damages and injunctive relief for, among other things, breach of the SPA, conversion related to the advanced funds, and defamation and injurious falsehood related to the press release.

**H. GmbH Wrongfully Works to Destroy Global's Business.**

66.      Shortly after the filing of the 225 Proceeding, the Superior Court Action, and the Second Chancery Action (collectively, the "Delaware Litigation"), GmbH initiated a new phase in its efforts to destroy Global and BV's business.

67.      These tactics included a number of wrongful and outright illegal acts. First, GmbH began communicating with Global employees, investors, and business partners, and falsely represented that the failure to close the merger between Global and Spectrum was caused by "illegal acts" on the part of Global, BV, and/or Barksdale.

68.      Second, GmbH continued to use WaveTech, Inc. marketing materials (the "WaveTech Teaser"), bearing BV's name and logo, in efforts to raise funds for GmbH. GmbH falsely claimed to investors that it controlled WaveTech, Inc. Additionally, the WaveTech Teaser—which BV did not approve being sent out by GmbH—misleadingly referred to WaveTech, Inc.'s analytics, services, software, and automation—products and services that are not controlled by GmbH.

69.      The use of BV's name and logo is, independently, false and misleading and is a violation of BV's trademark rights and independently constituted unfair competition.

70.      In addition, the WaveTech Teaser states that WaveTech, Inc. "will merge with a public US company and raise ~$10 million in conjunction with the merger to grow its global business."

71.      This statement was a breach of a certain provision found in Section 7 of the Preliminary Agreement, which provided that "none of the Parties shall make or permit any public or private announcement or communications in respect of the proposed transactions" without the prior written consent of the affected party.

15

72.     Despite a cease and desist letter being sent on June 19, 2019, GmbH, namely through its principal Dag Valand, continued its campaign of harassment and illegal fundraising.

73.     BV became aware of more monies being raised using BV's documents, and GmbH continued to improperly contact stakeholders regarding the dispute, spreading a number of false and malicious rumors regarding BV, Global, and Barksdale, for the purpose of interfering with BV's and Global's business relationships.

74.     The campaign of wrongful harassment had its desired effect: BV and Global were inundated with calls and emails regarding Global and BV's business. Investors, partners, and employees expressed their concerns, forcing Barksdale and others to divert time and effort to correct the facts.

75.     On Saturday, July 13, 2019, at 10:31 p.m., Barksdale received an email from the president of Southern Power Systems, Inc. ("SPSI"), a business partner of Global and BV, stating:

> I (and/or Southern Power Systems et al[.]) am no longer interested in working with BD [sic] Advisory Partners, LLC and/or WaveTech Global, Inc. The termination of this relationship is effective as of the date of this letter. It is hereby demanded that all intellectual property and/or proprietary/confidential information be returned to Draper/Southern Power immediately upon receipt of this letter.
>
> If you have any questions, please contact my counsel, Stephen R. McDonnell, of the law firm of Gawthrop Greenwood at 610-696-8225.

Unfortunately for BV and Global, SPSI's counsel could provide no information until the following Tuesday, July 16, on a scheduled 2 p.m. call.

76.     In the meantime, SPSI began unilaterally disconnecting certain equipment related to Global's business—specifically, a PCR Monitoring Box on an emergency communication tower site in Pennsylvania. The shutdown not only jeopardized Global's relationship with its customer,

the Commonwealth of Pennsylvania, but also risked a catastrophic chain of events that could disable the entire emergency response system.

77.     SPSI began cancelling orders placed and paid for by Global and BV, contacted clients and terminated Global's relationship with those clients, and then refused to hand over certain login and password information used to manage a contract with the Commonwealth of Pennsylvania.

78.     Additionally, another business partner of Global, Re-Tron, notified Global that it no longer wanted to do business with Global on July 16, 2019.

79.     Both Re-Tron and SPSI identified GmbH's dispute with Global as the reason for their decision.

80.     By the time of the 2 p.m. call with SPSI's counsel, Global's business had been devastated.  During the call, SPSI's counsel confirmed that SPSI would not be handing over the login information, taking the position that there was no deal between them.

81.     The following morning, Global and BV filed a lawsuit in the United States District Court for the Eastern District of Pennsylvania captioned *WaveTech Global, Inc. and BV Advisory Partners, LLC v. Southern Power Systems, Inc.*, C.A. No. 19-cv-3103.

82.     Thereafter, on July 18, 2019, Global and BV learned that SPSI had filed a Pennsylvania state court action on July 16, 2019 captioned *Southern Power Systems, Inc. v. WaveTech Global, Inc.*, Case No. 2019-06895-JR.

**I.   Spectrum and GmbH Announce Their Merger.**

83.     On July 16, 2019, at 7:45 a.m., Spectrum announced that it had entered into a definitive merger agreement with GmbH.  *See* Ex. B (Press Release).  In other words, GmbH had stolen BV's merger with Spectrum and had circumvented the Retention Agreement's exclusivity provision, specifically Section 10 of the Retention Agreement.

17

84.     With the July 16 announcement, everything that had occurred over the past several weeks became clear:  GmbH had been engaged in a concerted effort to scuttle the merger, to secretly negotiate a deal with Spectrum, to block the return of the $1.3 million in advanced funds, and to destroy Global's business.  In doing this, GmbH torched Global's business relationships with clients, employees, investors, customers, and other stakeholders using improper and unlawful means.

85.     The Retention Agreement provides that, in the event GmbH enters into a transaction, including a merger or sale of stock, with a person or entity introduced to it by BV Partners, then GmbH will pay to BV a fee equal to 10 percent of the consideration paid to and received by GmbH and/or its stockholders. *See* Retention Agreement at 4(c).  The fee is payable in cash at closing if a transaction is consummated during the term of the Retention Agreement or within 18 months after termination of the Retention Agreement. *Id.*  If the consideration is other than cash, the fee will be payable in cash based on the fair market value of the non-cash consideration. *Id.*

86.     Spectrum was introduced to GmbH by BV.

87.     Additionally, based on the new share purchase agreement filed with the SEC, it appears that the funds advanced by Global are now being used as part of the merger consideration.

88.     However, GmbH and the GmbH stockholders represent and warrant in the SPA that "[n]either the Company [GmbH] nor Sellers [GmbH stockholders] have employed or made or entered into any Contract with any broker, finder or similar agent or any other Person or firm in connection with the Transactions which may result in any liability to the Company or Buyer [Spectrum]." SPA p. 32 § 4.24.

89.     That representation is false.

90.     GmbH entered into a contract with BV Partners which, if the transaction is consummated, will result in liability to GmbH equal to 10 percent of the value of the cash and non-cash consideration paid to GmbH and its stockholders and a 10 percent commission on sales revenue of the post-merged combined company. The Retention Agreement has not been terminated.  Even if it had been, GmbH's obligation to pay BV's fee survives termination by 18 months.

91.     GmbH does not intend to pay BV its fee.

92.     BV seeks a declaration that the fee is owed and damages equivalent to the fee.

93.     GmbH's actions throughout have not been the product of fair competition between GmbH, BV, and Global.  They were instead the product of illegal and tortious conduct and material breaches of contract by GmbH.

94.     Neither Global nor BV has an adequate remedy at law.  Plaintiffs need immediate relief to prevent GmbH from taking further steps to destroy its business.

## FIRST CLAIM FOR RELIEF
### (INJUNCTIVE RELIEF)

95.     Plaintiffs reallege and incorporate by this reference paragraphs 1 through 94 above as if set forth in full herein.

96.     Plaintiffs Global and BV negotiated a transaction with Spectrum under the SPA.  In violation of the exclusivity provision of the Retention Letter, GmbH has now taken this transaction for itself.

97.     Plaintiffs have been irreparably harmed by virtue of the loss of the transaction. Given the uncertainties regarding the value potentially obtainable under the original transaction, and the potential value for BV Advisors and Global, BV Advisors seeks the entry of a temporary restraining order enjoining the closing of the merger between Spectrum and GmbH.  GmbH should

be enjoined until such time as this Court determines a suitable remedy which will adequately address the harm caused by GmbH hijacking the merger with Spectrum.

98.     Additionally, Plaintiffs seek an immediate injunction barring GmbH and its directors, officers, employees, stockholders, or representatives from contacting any directors, officers, employees, stockholders, or representatives of either of the Plaintiffs.

99.     Plaintiffs seek an immediate injunction barring GmbH and its directors, officers, employees, stockholders, or representatives from using any marketing materials created by or otherwise associated with BV or Global.

100.    Plaintiffs are without an adequate remedy at law.

## SECOND CLAIM FOR RELIEF
### (BREACH OF CONTRACT)

101.    Plaintiffs reallege and incorporate by this reference paragraphs 1 through 100 above as if set forth in full herein.

102.    BV and GmbH are parties to the Retention Agreement.

103.    Under Section 10 of the Retention Agreement, GmbH was required to "inform BV Partners of all other offers with respect to any United States Financing or United States Alternative Transaction, (including all inquiries and offers which the Company [GmbH] may have received concerning an investment in the Company [GmbH] prior to the date hereof."

104.    Additionally, GmbH agreed that it would not "circumvent, avoid, bypass, or obviate, directly or indirectly, the intent of the Agreement through any transaction, transfer, pledge, agreement, recapitalization, loan, lease, assignment or otherwise."

105.    Moreover, GmbH agreed that it would not "attempt, directly or indirectly, to contact parties introduced to the Company or negotiate with any confidential source provided by BV

20

Partners" and that GmbH would not "become involved in any transaction during the Term of the Agreement" with any entity introduced by BV without BV's permission.

106.    Section 10 further provides that "[a]ny violation of this provision shall be deemed an attempt to circumvent this provision, and the Company shall be liable for damages in favor of the circumvented party."

107.    By negotiating and entering into a deal with Spectrum, GmbH violated each of these provisions.

108.    Moreover, Spectrum was introduced to GmbH by BV and BV is entitled to its fee under the Retention Agreement.

109.    The Retention Agreement is a valid and effective agreement, and BV has fulfilled its obligations under the Retention Agreement or has been excused from performance by GmbH.

110.    BV has been harmed in an amount to be determined at trial but substantially in excess of $75,000.

### THIRD CLAIM FOR RELIEF
### (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

111.    Plaintiffs re-allege and incorporate by this reference paragraphs 1 through 110 above as if set forth in full herein.

112.    BV and GmbH are parties to the Retention Agreement under which GmbH was required to have any transactions that it sought to enter into negotiated by BV.  GmbH ignored this obligation, instead negotiating a secret merger agreement with Spectrum after improperly scuttling the merger between Spectrum and Global.

113.    There is an implied covenant of good faith and fair dealing in the contract between BV and GmbH, under which neither side may do anything to unfairly or unreasonably interfere with the right of the other party to receive and enjoy the benefits of the contract.  In improperly

scuttling the merger, ignoring the exclusivity provision, and negotiating a definitive agreement with Spectrum, GmbH breached this covenant. The breach was done in bad faith with the intent to harm BV.

114.    BV has been harmed in an amount to be determined at trial but substantially in excess of $75,000.

### FOURTH CLAIM FOR RELIEF
### (TORTIOUS INTERFERENCE WITH CONTRACT)

115.    Plaintiffs reallege and incorporate by this reference paragraphs 1 through 114 above as if set forth in full herein.

116.    GmbH intentionally and unlawfully disrupted the business relationships between BV and Global, on the one hand, and SPSI and Re-Tron, on the other, when it contacted these business partners and led such partners to terminate their relationships with BV and Global. BV and Global have proof that such parties were contacted, and that the reason that they were terminating the relationship was because of GmbH.

117.    GmbH's interference has led to the cancellation of contracts, the shutdown of equipment, and the termination of business relationships.

118.    GmbH acted wrongfully and without any business justification.

119.    GmbH also had knowledge in advance of the aforementioned business relationships.

120.    As the direct and proximate result of GmbH's actions, BV and Global have been damaged in an amount to be determined according to proof at time of trial but an amount substantially in excess of $75,000.

## FIFTH CLAIM FOR RELIEF
### (INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE)

121.    Plaintiffs re-allege and incorporate by this reference paragraphs 1 through 120 above as if set forth in full herein.

122.    In the alternative, GmbH intentionally and unlawfully disrupted the prospective business relationships between BV and Global, on the one hand, and SPSI and Re-Tron, on the other when it contacted these business partners and led such partners to terminate their relationships with BV and Global.  BV and Global have proof that such parties were contacted, and that the reason that they were terminating the relationship was because of GmbH.  Unknown at this time is the other relationships that have been interfered with.

123.    The incoming orders received as part of the SPSI/Global partnership evidences a reasonable probability of a business opportunity and/or a prospective contractual relationship. GmbH intentionally communicated without any justification with SPSI and Re-Tron leading to the termination of the relationships.    Such actions intentionally interfered in those prospective relationship, causing injury.

124.    GmbH acted wrongfully and without any business justification.

125.    GmbH also had knowledge in advance of the aforementioned prospective business relationships.

126.    As the direct and proximate result of GmbH's actions, BV and Global have been damaged in an amount to be determined according to proof at time of trial but an amount substantially in excess of $75,000.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against GmbH as follows:

A.      With respect to the First Claim for Injunctive Relief:

      (1)     An immediate injunction, either in the form of a Temporary Restraining Order or a Preliminary Injunction, enjoining the closing of any transaction between GmbH and Spectrum;

      (2)     An immediate injunction, either in the form of a Temporary Restraining Order or a Preliminary Injunction, enjoining GmbH and its directors, officers, employees, stockholders, or representatives from contacting any directors, officers, employees, stockholders, or representatives of either of the Plaintiffs;

      (3)     An immediate injunction, either in the form of a Temporary Restraining Order or a Preliminary Injunction, enjoining GmbH and its directors, officers, employees, stockholders, or representatives from using any marketing materials created by or otherwise associated with BV or Global; and

      (4)     Permanent injunctive relief with respect to each of these issues.

B.     With respect to the Second and Third Claims for Relief:

      (1)     Compensatory damages according to proof;

      (2)     Pre-judgment interest to the extent allowed by law; and

      (3)     Post-judgment interest to the extent allowed by law.

C.     With respect to the Fourth and Fifth Claims for Relief:

      (1)     Compensatory damages according to proof;

      (2)     Pre-judgment interest to the extent allowed by law;

      (3)     Post-judgment interest to the extent allowed by law;

      (4)     Exemplary and punitive damages; and

(5)    Such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by a jury

of 12 persons on all issues so triable.

Dated: July 19, 2019

ARENT FOX LLP

David N. Wynn (DW-8660)
Charles Gallaer  (CG-1301)
1301 Avenue of the Americas, Floor 42
New York, New York 10019
Tel:  (212) 484-3920
Fax:  (212) 484-3990
Email:  david.wynn@arentfox.com

-and-

**HALLORAN FARKAS + KITTILA LLP**

Theodore A. Kittila (TK-6715)
James G. McMillan, III
(*pro hac vice* to be filed)
5803 Kennett Pike, Suite C
Wilmington, Delaware 19807
Tel: (302) 257-2011
Fax: (302) 257-2019
Email: tk@hfk.law
        jm@hfk.law

*Attorneys for Plaintiffs*